KPO&JS/2022R00849

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| v. | : | Crim. No. 24-836 |
| | : | Crim. No. 24-837 |
| AVIN INTERNATIONAL LTD and | : | 18 U.S.C. § 1505 |
| KRITI RUBY SPECIAL MARITIME | : | 18 U.S.C. § 1519 |
| ENTERPRISES | : | 33 U.S.C. § 1908(a) |
| | : | 18 U.S.C. § 2 |

## INFORMATION

The defendants having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey and the Assistant Attorney General for the Environment and Natural Resources Division of the U.S Department of Justice charge:

## COUNT ONE
**(Act to Prevent Pollution from Ships – 33 U.S.C. § 1908(a))**

1. At all times relevant to this Information, unless otherwise indicated:

<u>The Defendants</u>

  a. Defendant Avin International Ltd (hereinafter, "AVIN") was a ship management company with an office in Athens, Greece. AVIN operated a fleet of sea-going vessels, including the *Motor Tanker Kriti Ruby* (hereinafter, the "*M/T Kriti Ruby*" or the "vessel").

1

    b. Defendant Kriti Ruby Special Maritime Enterprises (hereinafter, "KRITI RUBY SME") was a Greece-domiciled company that shared an office in Athens, Greece, with AVIN. KRITI RUBY SME was the registered owner of the *M/T Kriti Ruby*.

The *M/T Kriti Ruby*

    c. The *M/T Kriti Ruby* was a 29,832 gross ton ocean-going oil tanker that was registered in Greece and had an International Maritime Organization number of 9391282. The vessel transported petroleum products among the United States, Europe, and Africa.

    d. The *M/T Kriti Ruby* had an Engine Department in which crew members of different ranks worked. The Engine Department was headed by a Chief Engineer, who was assisted by a Second Engineer. The Chief Engineer and Second Engineer were also assisted by two Third Engineers, an Electrician, and two Wipers. In addition to having specific responsibilities assigned to each of them based on their respective ranks, Engine Department crew members were required to carry out orders from any crew member of superior rank. Each crew member of the Engine Department was an agent or employee of AVIN and KRITI RUBY SME and acted within the scope of that agency or employment and for the intended benefit, at least in part, of the defendants.

    e. The Chief Engineer on board the *M/T Kriti Ruby* had overall responsibility for the operation of the Engine Department, including the supervision

of daily operations, formulation and implementation of engine room procedures, and verification that all systems, including the Oily Water Separator ("OWS"), a pollution prevention device required by law, were properly functioning. The Chief Engineer reported directly to the Master of the Vessel and to shore-side personnel. The Second Engineer was responsible for the day-to-day execution of the Chief Engineer's orders, and had authority to direct the Third Engineers, Electrician, and Wipers.

        f.     The Master of the *M/T Kriti Ruby* was responsible for maintaining an Oil Record Book that accurately recorded, among other things, the transfer, disposal, and discharge overboard of oil residue, oil and oily mixtures, and machinery space bilge water on board the vessel. When directing junior crew members to perform operations that were required to be recorded in the Oil Record Book, the Chief Engineer and the Second Engineer, as the crew members in charge of the operation, were required to sign the entries documenting such operations.

        g.     Sea-going tankers, such as the *M/T Kriti Ruby*, generate large quantities of oil-contaminated waste, the proper disposal of which may result in costs to the vessel's Owner and Operator. The normal operations of an ocean-going vessel produce significant quantities of oil sludge due to the process of purifying fuel oil and lubricating oil. In addition, the engineering machinery of virtually all ocean-going vessels leaks and drips large amounts of oil-contaminated water that collects in the bottom of the vessel, known as the bilges. This oil-contaminated machinery

space bilge water must be regularly discharged to help ensure the vessel's seaworthiness.

The Act to Prevent Pollution from Ships and the MARPOL Protocol

      h.    The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 *et seq.*, was enacted by Congress in 1980 to implement two related international treaties to which the United States was a signatory: the 1973 International Convention for the Prevention of Pollution from Ships; and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. *See* 33 C.F.R. § 151.01 *et seq*. Together, these treaties, which sought to minimize pollution from ocean-going vessels, were known as the "MARPOL Protocol" or "MARPOL."

      i.    APPS made it a crime for any person to knowingly violate MARPOL, APPS, or the regulations promulgated under APPS. These regulations applied to all commercial vessels operating in the navigable waters of the United States or while in a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States.

      j.    APPS also authorized the United States Coast Guard (hereinafter, the "Coast Guard"), an agency within the United States Department of Homeland Security, to promulgate regulations implementing the MARPOL Protocol, pursuant to Title 33, United States Code, Section 1903(c)(1). Pursuant to that authority, the

Coast Guard established Title 33, Code of Federal Regulations, Sections 151.01 *et seq.*, to ensure compliance with the MARPOL Protocol and to prevent pollution in United States waters.

Regulation of Oil-Contaminated Waste from Ocean-Going Vessels

      k.    Principal sources of water pollution addressed by the MARPOL Protocol, APPS, and APPS regulations were the oil residue, oil and oily mixtures, and oil-contaminated bilge water generated in the machinery space of large vessels, such as the *M/T Kriti Ruby*.

      l.    The oil residue, oil and oily mixtures, and machinery space bilge water of such vessels were collected in tanks designed to hold the waste for proper disposal. Regulation 15 of MARPOL, Annex I, and Title 33, Code of Federal Regulations, Section 151.10(a)(5), provided that any discharge of oil or oily mixtures into the sea from the machinery space bilges of an oil tanker, when the vessel is more than 12 nautical miles from the nearest land, were prohibited unless, among other things, the discharges contained no greater than 15 parts of oil per million parts of water by volume ("15 ppm"). To facilitate the discharge of oily mixtures without causing pollution, all large vessels were required to have an OWS. The OWS was designed to filter oil contamination from bilge waste to produce effluent containing no greater than 15 ppm of oil, as measured by the OWS's Oil Content Monitor. If the Oil Content Monitor detected an oil content of greater than 15 ppm in the effluent, it sounded an alarm, and shut down the pumps or diverted flow back

to the bilges or to a storage tank designed to hold bilge water to prevent a discharge of greater than 15 ppm of oil overboard. The MARPOL Protocol and APPS also required that oil residue and other oily mixtures, which could not be processed through pollution control equipment, be disposed of by either burning such oily waste in a vessel's incinerator or by off-loading it to shore for proper disposal.

<u>Requirement that Vessels Maintain an Oil Record Book</u>

   m. To ensure that oily waste was properly processed and disposed of, Regulation 17 of MARPOL, Annex I, and Title 33, Code of Federal Regulations, Section 151.25(a), (d), and (h), provided that, with regard to oil tankers of at least 150 gross tons, each operation involving the disposal of oil residue, or the disposal or discharge overboard of bilge water, was required to be fully recorded, without delay and on a tank-to-tank basis, and signed by the person or persons in charge of the operation, in a log known as an Oil Record Book. In addition, all emergency, accidental, or other exceptional discharges of oil or oil mixtures, including a statement of the circumstances of, and reasons for, the discharge, were also required to be recorded in the Oil Record Book, pursuant to Title 33, Code of Federal Regulations, Section 151.25(g). The Oil Record Book was required to be maintained on board the vessel for not less than three years and be readily available for inspection at all reasonable times, pursuant to Title 33, United States Code, Section 151.25(k).

United States Enforcement of APPS

   n. The Coast Guard was authorized to conduct inspections to determine whether vessels in U.S. waters were in compliance with MARPOL, APPS, and other applicable federal regulations.  In conducting its inspections, the Coast Guard was authorized to examine the vessel's Oil Record Book to determine, among other things, whether the vessel had operable pollution prevention equipment, whether it posed a danger to United States ports and waters, and whether the vessel had discharged any oil or oily mixtures in violation of law, pursuant to Title 33, Code of Federal Regulations, Section 151.23(a)(3) and (c).  In conducting inspections, the Coast Guard relied on the vessel's Oil Record Book to determine whether the vessel's crew was properly handling oil or oily mixtures pursuant to Title 33, Code of Federal Regulations, Section 151.23(c).

Transfers and Discharges of Oil-Contaminated Waste from the *M/T Kriti Ruby*

   o. On multiple occasions, from at least as early as in or around May 2022, through in or around September 2022, Defendants AVIN and KRITI RUBY SME, by and through the acts of senior engineering officers, including those of the rank of Chief Engineer, directed and authorized lower-level engine room crew members to transfer machinery space bilge water, using portable pumps and flexible hoses (hereinafter, collectively, the "bypass equipment"), into the Sewage Holding Tank. The bypass equipment, which contained no filter, suctioned oily bilge water from multiple bilge wells and pumped it to an upper floor of the Engine Room into

7

the Sewage Holding Tank through an opening at the top of the tank.

p.     Defendants AVIN and KRITI RUBY, by and through the acts of Engine Department crew members, then discharged the oily bilge water via the Sewage Holding Tank's overboard discharge valve into the sea without processing it through the vessel's OWS.

q.     On September 4, 2022, Defendants AVIN and KRITI RUBY SME, by and through the acts of the vessel's Second Engineer, used the bypass equipment to transfer oily bilge water from the vessel's starboard bilge well to the Sewage Holding Tank. Defendants AVIN and KRITI RUBY SME, by and through the acts of Engine Department crew members, then discharged the oily bilge water overboard into the sea without filtering it through the vessel's OWS.

r.     In August 2022, Defendants AVIN and KRITI RUBY SME, by and through the acts of the vessel's Second Engineer, installed a copper tube on the vessel's incinerator waste oil tank to drain condensation from that tank to a bucket. Defendants AVIN and KRITI RUBY SME, by and through the acts of the Second Engineer and lower-level Engine Department crew members, transferred oily mixtures from the bucket to a toilet in the engine room, the contents of which were transferred to the Sewage Treatment Plant and subsequently discharged into the sea without being filtered through the vessel's OWS.

s.     Defendants AVIN and KRITI RUBY SME, by and through the acts of Engine Department crew members, concealed most of the bypass equipment

in a sealed void space in the vessel's Engine Room, known as a cofferdam, prior to the vessel's berthing at a petroleum offloading terminal in or around Sewaren, New Jersey (hereinafter, the "Sewaren Terminal"), on or about September 14, 2022.

Oil Record Book Omissions

t. During a Port State Control inspection conducted by the Coast Guard at the Sewaren Terminal on or about September 15, 2022, the Chief Engineer presented for inspection to the Coast Guard an Oil Record Book for the *M/T Kriti Ruby* that, among other things, failed to record the following: 1) transfers of oily bilge water from the bilges to the Sewage Holding Tank; 2) transfers of oily mixtures from the incinerator waste oil tank to the Sewage Treatment Plant via the engine room toilet; and 3) discharges of oily bilge water and oily mixtures from the Sewage Holding Tank into the sea.

2. On or about September 15, 2022, at a petroleum offloading terminal in or around Sewaren, New Jersey, in the District of New Jersey, and elsewhere, the Defendants,

AVIN INTERNATIONAL LTD and KRITI RUBY SPECIAL MARITIME ENTERPRISE,

by and through the acts of senior engineering officers, including the Chief Engineer, of the *M/T Kriti Ruby*, who were acting within the scope of their agency and employment, and with the intent to benefit the Defendants, at least in part, knowingly failed to maintain an accurate Oil Record Book for the *M/T Kriti Ruby* as prohibited by Title 33, Code of Federal Regulations, Section 151.25.

In violation of Title 33, United States Code, Section 1908(a), and Title 18, United States Code, Section 2.

## COUNT TWO
### (Falsification of Records - 18 U.S.C. § 1519)

3.  Paragraph 1 of Count One of this Information is re-alleged and incorporated herein.

4.  On or about September 15, 2022, at a petroleum offloading terminal in or around Sewaren, New Jersey, in the District of New Jersey, and elsewhere, the Defendants,

AVIN INTERNATIONAL LTD and
KRITI RUBY SPECIAL MARITIME ENTERPRISE,

by and through the acts of senior engineering officers, including the Chief Engineer, of the *M/T Kriti Ruby*, who were acting within the scope of their agency and employment, and with the intent to benefit defendants, at least in part, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Coast Guard, an agency of the United States, and in relation to and in contemplation of such matter, namely, an inspection of the *M/T Kriti Ruby* to determine its compliance with United States law, did knowingly conceal, cover up, and falsify, and make false entries in, a record and document, namely, the Oil Record Book for the *M/T Kriti Ruby*, which concealed: 1) transfers of oily bilge water to the Sewage Holding Tank; 2) transfers of oily mixtures from the incinerator waste oil tank to the Sewage Treatment Plant via the Engine Room toilet; 3) overboard discharges of oily bilge water from the Sewage Holding Tank without processing the oily bilge water

11

through the Oily Water Separator; and 4) overboard discharges of oily mixtures from the Sewage Treatment Plant without processing the oily mixtures through the Oily Water Separator.

In violation of Title 18, United States Code, Section 1519, and Title 18, United States Code, Section 2.

## COUNT THREE
### (Obstruction of Justice – 18 U.S.C. § 1505)

5. Paragraph 1 of Count One of this Information is re-alleged and incorporated herein.

6. On or about September 15, 2022, at a petroleum offloading terminal in or around Sewaren, New Jersey, in the District of New Jersey, and elsewhere, the Defendants,

AVIN INTERNATIONAL LTD and
KRITI RUBY SPECIAL MARITIME ENTERPRISE,

by and through the acts of Engine Department crew members of the *M/T Kriti Ruby*, who were acting within the scope of their agency and employment, and with the intent to benefit defendants, at least in part, did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the law under which a pending proceeding was being had by an agency of the United States, namely, an inspection of the *M/T Kriti Ruby* by the United States Coast Guard, by concealing bypass equipment in a sealed cofferdam in the vessel's Engine Room.

In violation of Title 18, United States Code, Section 1505, and Title 18, United States Code, Section 2.

_Philip R. Sellinger_
PHILIP R. SELLINGER
United States Attorney
District of New Jersey

TODD KIM
Assistant Attorney General
Environment and Natural
Resources Division
U.S. Department of Justice